UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:25-cr-00030-LEW |
| | ) | |
| ALEXANDER BRIDGES, | ) | |
| | ) | |
| Defendant | ) | |

**ORDER ON DEFENDANT'S MOTION TO SUPPRESS**

Defendant Alexander Bridges has been indicted on one count of possession of child pornography, in violation of 18 U.S.C. § 2252A. This matter is before the Court on Defendant's Motion to Suppress (ECF No. 92). For the reasons that follow, the Motion is DENIED.

**BACKGROUND**

The following facts are drawn from the parties' briefs and exhibits thereto. On August 25, 2020, Homeland Security Investigations (HSI) Special Agent James Bell applied for a warrant to search an address in York, Maine. *See* Def. Ex. 1 (ECF No. 92-1). In support of that application, Special Agent Bell described the facts that (in his view) established probable cause to believe that a crime had occurred—specifically, attempted receipt or possession of, or access with intent to view child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A) and (a)(5)(B)—and that evidence of that crime would be found at that address. According to that affidavit, a "user of the internet account at the SUBJECT PREMISES," that is, the York address to be searched, "has been linked to an online

community of individuals who regularly send and receive child pornography via a hidden service website that operated on the Tor anonymity network." Def. Ex. 1 ¶ 5. The Tor Network "is a computer network . . . designed specifically to facilitate anonymous communication over the internet . . . by routing Tor user communications through a globally distributed network of relay computers, along a randomly assigned path known as a 'circuit,'" in order to evade "traditional IP address-based identification techniques." Def. Ex. 1 ¶ 7.

The hidden service website already mentioned, which Special Agent Bell refers to as "the TARGET WEBSITE,"[1] "was an online bulletin board dedicated to the advertisement and distribution of child pornography that operated from approximately at least September 2016 to June 2019," when the computer server hosting the website was seized by a foreign law enforcement agency. Def. Ex. 1 ¶ 14. The website's homepage displayed hyperlinks for "Announcements" and "Important Information." Def. Ex. 1 ¶ 15. Upon accessing the link for "Announcements," a message entitled, "Welcome, please read before registering" would display, followed by:

> Welcome abusers and abusees and those that enjoy watching. This website was created to host videos, photos and discussions of 18 (twinks) and younger of Hurtcore materials (videos & pictures) as well as discussion of such. . . . PS Please register to see all the forums, and use strong password for user profile.

Def. Ex. 1 ¶ 16. Accessing the link to register would prompt users to create a username and password. Def. Ex. 1 ¶ 17. The website also included a feature that allowed users to

[1] Special Agent Bell offered the assurance that law enforcement knew the name of the Target Website, but declined to identify it in order to protect ongoing investigations. Def. Ex. 1 ¶ 5 n.1. The Government, it seems, has continued this practice throughout this prosecution so far. *See* Def. Reply at 9.

send private messages to each other. *Id.* It is not clear from Special Agent Bell's description what of the Target Website's content would have been available to a user who had not registered.

Entering the website afforded the user access to various forums to which content could be posted and shared, with titles such as "HURTCORE Toddlers Videos (Ages 0-5)," "Preteen/Hebe Children Videos (Ages 6-13)," and "Teens Videos (Ages 14+)." *Id.* There were also forums for sharing images (as opposed to videos) and for "GORE/DEATH," similarly organized by age. *Id.* Each of these forums and subforums contained pages of "topics," which consisted of an originating post and replies. Def. Ex. 1 ¶ 19. A typical post contained some combination of "text, images, thumbnail previews of images, [or] links to external sites with compressed files." *Id.* According to Special Agent Bell, a "review of topics within these sections revealed numerous posts containing images and/or videos depicting child pornography and child erotica of prepubescent males, females, toddlers, and infants," including depictions of "anal, vaginal, and oral penetration," as well as "numerous posts containing images and/or videos depicting child pornography involving gore and sometimes death." Def. Ex. 1 ¶ 20. The affidavit provides examples of "topics" created by users and graphic descriptions of the contents of posts therein. *See* Def. Ex. 1 ¶¶ 21-22. Special Agent Bell also explains that posts from the website that "were publicly available to any registered user . . . were captured and archived for law enforcement review," and describes in detail videos and images that he observed in that review. *See* Def. Ex. 1 ¶¶ 23.a-b. He provided a still image from one of those videos as an attachment to the affidavit. *See* Def. Ex. 1 ¶ 23.a.

Following this description of the Target Website and its contents, Special Agent Bell explained that the FBI received a tip in August 2019 from "a foreign law enforcement agency (referenced herein as 'FLA') known to the FBI and with a history of providing reliable, accurate information in the past." Def. Ex. 1 ¶ 25; *see also id.* ¶ 27 (describing history of cooperation between the FLA and U.S. law enforcement). According to the FLA, a particular IP address "'was used to access online child sexual abuse material' via a website that the FLA named and described as the TARGET WEBSITE" on May 30, 2019. *Id.* The FLA also advised that the website had "an explicit focus on the facilitation of sharing child abuse material (images, links and videos), emphasis on BDSM, hurtcore, gore and death-related material including that of children," and that "[u]sers were required to create an account (username and password) in order to access the majority of the material." *Id.* If the FLA provided any additional details about this particular user's activity on the Target Website, Special Agent Bell did not include that information in his affidavit.

Special Agent Bell explained that the website "could not generally be accessed through the traditional internet" because "[o]nly a user who had installed the appropriate Tor software on the user's computer could access the 'TARGET WEBSITE.'" Def. Ex. 1 ¶ 28. That is not all:

> Even after connecting to the Tor network, however, a user would have to find the 16-or-56 character web address of the TARGET WEBSITE in order to access it. Hidden service websites on the Tor network are not 'indexed' by search engines—such as Google—to anywhere near the same degree as websites that operate on the open internet. Accordingly, it is much more difficult to perform a Google-type search of hidden service websites than it is to search open internet websites for particular content of interest. Users interested in accessing child exploitation material (or in advertising child exploitation and pornography websites they operate) therefore keep, maintain and use directory sites that advertise the web addresses of hidden

> services that contain child exploitation related content. Those directory sites also operate via the Tor network. . . . As with other hidden service websites, a user must find the 16-or-56 character web address for a directory website in order to access it. While it operated, the web address for the website described herein was listed on one or more of such directory sites advertising hidden services dedicated to the sexual exploitation of children.

*Id*. Moreover, from "consultation with FBI agents," Special Agent Bell was aware "that the review of detailed user data related to one Tor-network-based child pornography website found that it was exceedingly rare for a registered website user to access that website and never return"—according to this FBI review of the user data, "less than two hundredths of one percent of user accounts registered an account on the website, accessed a message thread on the website, and then never returned to the website" through the same account. Def. Ex. 1 ¶ 29. Finally, Special Agent Bell reported that from his training and experience through other investigations, he knows: (1) that "individuals interested in child pornography" use computers for "production, communication, distribution, and storage" of child sexual abuse material, Def. Ex. 1 ¶ 38.a; and (2) that evidence that a user accessed, possessed, or distributed such material electronically can be found on the user's devices, *see* Def. Ex. 1 ¶¶ 38.a-h, 39.e-f, 42. Special Agent Bell also reported knowledge of "certain characteristics common to individuals who access online child sexual abuse and exploitation material" online, including a tendency to collect such material. Def. Ex. 1 ¶ 39.

With the tip from the FLA, the FBI (and later, HSI) obtained records from Charter Communications, Inc., that identified the owner of the account associated with the specified IP address, as well as the residential address and contact information connected

with the account, which Special Agent Bell confirmed was consistent with vehicle registration and property records. Def. Ex. 1 ¶¶ 32-36.

On these grounds, Special Agent Bell sought permission to search the residential address in York, Maine, and seize computers and storage media; routers, modems, and network equipment; child pornography, as defined by statute; records, information, and items relating to ownership or occupancy of the premises, computer equipment, identity, and the exploitation of children. *See* Def. Ex. 1, Att. A & B. A United States Magistrate Judge approved the search warrant application on August 25, 2020.

Special Agent Bell and others executed the search warrant on August 26, 2020, and seized several electronic devices, which contained the alleged child sexual abuse material underlying Defendant's indictment in this case. *See* Gov't Resp. at 5 (ECF No. 96).

**DISCUSSION**

The Fourth Amendment prohibits "unreasonable searches" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. "An application for a warrant must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place searched—the so-called 'nexus' element." *United States v. Gonzalez*, 113 F.4th 140, 148 (1st Cir. 2024) (citations omitted). The probable cause standard "is not a high bar," requiring "only 'the kind of fair probability on which reasonable and prudent people, not legal technicians, act.'" *United States v. Sheehan*, 70 F.4th 36, 44 (1st Cir. 2023) (internal citations and alterations omitted). "Fair probability is less than a more-likely-than-not standard." *United States v.*

*Daigle*, 178 F.4th 55, 61 (1st Cir. 2026) (citation omitted). In determining whether the search warrant affidavit meets this bar, I consider "the totality of the circumstances . . . based on the facts and supported opinions set out within the four corners of the affidavit." *United States v. Cortez*, 108 F.4th 1, 8 (1st Cir. 2024) (internal citations and alterations omitted). The Magistrate Judge's initial determination receives "significant deference," and must be upheld unless there is "no 'substantial basis' for concluding that probable cause existed." *United States v. Chiu*, 36 F.4th 294, 297 (1st Cir. 2022) (citation omitted); *see also Cortez*, 108 F.4th at 7 ("We accord considerable deference to reasonable inferences the issuing justice may have drawn from the attested facts, and in a doubtful or marginal case, the court defers to the issuing magistrate's determination of probable cause.") (internal citations and alterations omitted).[2]

Defendant contends that Special Agent Bell's affidavit does not establish the required "nexus" between the evidence of criminal activity and the place to be searched. He argues that whatever Special Agent Bell averred about the contents of the Target Website, all that tied Defendant's residence to that website is the FLA tip that his IP address "'was used to access online child sexual abuse material' via a website the FLA named and described as the TARGET WEBSITE," on May 30, 2019. Def. Ex. 1 ¶ 25.

---

[2] Because this evaluation is confined to those "facts and supported opinions set out within the four corners of the affidavit," *Cortez*, 108 F.4th at 8 (citation omitted), I have no need to hear additional evidence on Defendant's motion. Nor was any such hearing requested.

With the benefit of advocacy and adversarial briefing, it is easy to look back over Special Agent Bell's affidavit and reflect on the facts that are missing[3] or additional investigative steps that could have been taken but were not. But the task before me is to evaluate the facts set out within the four corners of the affidavit and decide whether the Magistrate Judge had no substantial basis for concluding that probable cause had been met. *Chiu*, 36 F.4th at 297. According to Special Agent Bell's affidavit:

- The FLA, known to be reliable, informed the FBI that a specific IP address (later determined to be associated with Defendant) "'was used to access online child sexual abuse material' via . . . the TARGET WEBSITE" on May 30, 2019. Def. Ex. 1 ¶ 25. The FLA further advised that the Target Website had "an explicit focus on the facilitation of sharing child abuse material (images, links and videos), emphasis on BDSM, hurtcore, gore and death-related material including that of children." *Id*.

- The "Announcements" page informed users prior to registering that "[t]his website was created to host videos, photos and discussions of 18 (twinks) and younger of Hurtcore materials (videos & pictures) as well as discussion of such." Def. Ex. 1 ¶ 16.

- Upon registering, users gained full access to discussion-board type forums containing child sexual abuse material. *See* Def. Ex. 1 ¶¶ 19-23.

- The Target Website cannot be accessed through traditional internet search engines. Def. Ex. 1 ¶ 28. To access the site, a user would have to install Tor software and enter Target Website's 16- or 56-character web address. *Id*. To find the Target Website's web address, the user would likely have consulted a directory advertising hidden services (like this one) "that contain child exploitation content," which itself would only be accessible through a 16- or 56-character web address. *Id*. As a result, it was unlikely that an internet user would stumble upon the Target Website by accident. *Id*.

[3] For example, what content Defendant accessed on the Target Website, how long he spent there, and whether he took steps to register an account, download certain images or videos, or upload others.

I have no trouble inferring from these facts that the primary purpose of the Target Website was to share child sexual abuse material, even if this may not have been its sole purpose. It is also reasonable to conclude that the user who visited the Target Website from Defendant's IP address on May 30, 2019, did so intentionally—in other words, that it is highly unlikely that this user encountered the Target Website by accident. This, in turn, establishes a "fair probability" that any user who accessed the Target Website—even just once—did so knowingly, and with the intent to access child pornography. *See United States v. Anzalone*, 923 F.3d 1, 5 (1st Cir. 2019). And it is reasonable to expect to find evidence of what people do on their electronic devices on those devices. *See* Def. Ex. 1 ¶¶ 38.a-h, 39.e-f, 42. I believe tallying up all of these circumstances yields a sum that clears the modest "fair probability" post, that a crime had been committed, and that evidence of that offense would be found at the place searched. *See Daigle*, 178 F.4th at 61; *see also United States v. Sanders*, 107 F.4th 234, 250 (4th Cir. 2024) (recognizing that even if, "as a general proposition . . . a 'single click' of an Internet link will not establish probable cause to search a residence for evidence of child pornography," this generality does not hold where "there are solid additional facts to suggest that 'the person behind the click plausibly knew about and sought out' child pornography") (citation omitted).[4] The probable cause hurdle "is not a high bar," *Sheehan*, 70 F.4th at 44, and the Magistrate

[4] Indeed, *Sanders* involved a challenge to a warrant based on a similar FLA tip involving a similar website. In that case, the Fourth Circuit held that "a single instance of accessing child pornography" on the website sufficed to establish probable cause to search the user's residence, because "the requisite affirmative steps to access [the website] and the pornographic material thereon strongly suggest that the Internet user knew that such content was located on the site and had actively sought out such material." *Sanders*, 107 F.4th at 250.

Judge's determination is entitled to "considerable deference . . . in a doubtful or marginal case," *Cortez*, 108 F.4th at 7.

Defendant argues that this is not enough, citing *United States v. Falso*, in which the Second Circuit held that an affidavit that lacked any "specific allegation that [the defendant] accessed, viewed or downloaded child pornography" from the website in question did not establish probable cause. 544 F.3d 110, 121 (2d Cir. 2008). In so holding, the Second Circuit emphasized that the affidavit only stated "that it 'appear[ed]' that [the defendant] 'gained access or attempted to gain access'" to a public, "non-member" website,[5] and that while there were "eleven images of child pornography" on the website, there was no "information about whether the images were prominently displayed or required an additional click of the mouse; whether the images were downloadable; or what other types of services and images were available on the site." *Id*. This distinguished *Falso* from earlier cases involving comparable facts, where the affidavit specified that the website had "a 'Files' section that enabled users to pose images and video clips for other members 'to access and download,'" and "welcome pages" that "announced the e-groups' central purpose to trade child pornography." *Id*. (citing *United States v. Martin*, 426 F.3d 68, 70, 75 (2d Cir. 2005) and *United States v. Coreas*, 419 F.3d 151, 157 (2d Cir. 2005)). Special Agent Bell's description of the Target Website includes references to similar features, making this case more like *Martin* and *Coreas*, and less like *Falso*.

---

[5] By contrast, Special Agent Bell's affidavit includes information from the FLA that a specific IP address "'was *used to access* online child sexual abuse material' via . . . the TARGET WEBSITE," Def. Ex. 1 ¶ 25 (emphasis added). Of course, the affidavit does not explain how the FLA made that determination in a way that would permit critical assessment of the conclusion reached, which somewhat diminishes the weight of that conclusion.

Relatedly, Defendant also contends that the affidavit does not establish that the specific images and videos of child pornography described therein were actually accessed or downloaded by him.[6] Perhaps not, but I am not convinced that this is fatal in light of the other facts set out in the affidavit. "[P]robable cause determinations hinge not on discrete pieces of standalone evidence, but on the totality of the circumstances." *Anzalone*, 923 F.3d at 5. As discussed above, the totality of the circumstances laid out in the affidavit include that the Target Website's self-described purpose was "to host videos, photos and discussions of 18 (twinks) and younger of Hurtcore materials (videos & pictures)," Def. Ex. 1 ¶ 16, and that illegal videos and images were in fact available on the Target Website, including some that were originally posted in October and November 2016, *see* Def. Ex. 1 ¶¶ 20-21, and others that Special Agent Bell personally viewed that had been archived for law enforcement review when the website was seized, *see* Def. Ex. 1 ¶ 23. It was reasonable to infer that illegal material was available on the Target Website on May 30, 2019. The Target Website was operated on the Tor Network for a reason and announced

[6] On this point, Defendant also cites *United States v. Sheehan*, 70 F.4th 36 (1st Cir. 2023), and *United States v. Brunette*, 256 F.3d 14 (1st Cir. 2001), although this appeal is somewhat perplexing. In *Brunette*, the First Circuit rejected a search warrant affidavit that offered only the "bare legal assertion" that the images in question met the statutory definition of child pornography. 256 F.3d at 17. Similarly, in *Sheehan*, the First Circuit held that the affidavit before it did not describe the images in that defendant's possession with sufficient specificity to allow the magistrate to determine whether the images were illegal child pornography or perfectly innocent depictions. Unlike *Brunette* and *Sheehan*, there is no question here that Special Agent Bell achieved the First Circuit's doctrinaire demands for unsparing description of the kinds of images available on the Target Website, which suffice to establish the illegal nature of those images. Neither *Sheehan* nor *Brunette* has anything to say about what an affidavit that adequately describes illegal images must additionally set forth to establish a fair probability that evidence related to criminal offenses involving those images will be found in the place to be searched. Despite the foreshadowing of those cases, it is difficult to imagine any First Circuit composition that would, in light of the deference owed to the Magistrate Judge, conclude that he had no substantial basis to conclude that probable cause existed under the sum total of the foregoing circumstances.

on its doorstep that its contents would include illicit images. This, combined with the other facts discussed above, establishes at least a fair probability that a user seeking out the Target Website does so to access illegal content. As a result, there was a fair probability that the single instance of access documented by the FLA was connected to a criminal offense, evidence of which could be found on electronic devices associated with the IP address in question. At the very least, it is not the case that the Magistrate Judge had "no 'substantial basis'" for concluding so. *Chiu*, 36 F.4th at 297.

To the extent Defendant argues that law enforcement needed probable cause to believe that they would find child pornography, I disagree. The "probable cause inquiry is shaped by the specific crime for which the police sought evidence." *Sheehan*, 70 F.4th at 45. None of the offenses Special Agent Bell believed to a fair probability had occurred—attempted receipt, attempted possession, or access with intent to view—demand proof that a defendant actually possessed illegal material. But perhaps more importantly, I am not convinced that the affidavit provided no substantial basis to support the conclusion that such material could be found at the place to be searched, in light of (1) the facts discussed above that establish a fair probability that whoever accessed the Target Website on May 30, 2019, did so intentionally, to access child pornography; and (2) Special Agent Bell's understanding (informed by training and experience) that people who access child pornography in this manner tend to maintain personal collections of their own, *see* Def. Ex. 1 ¶ 39.

As Defendant points out, the Target Website appears to have contained at least some "legal" content. Defendant also observes that the Tor Network is not exclusively used to

conduct criminal activity. Although these observations bear upon the strength of the inference to be drawn from the single reported visit to the Target Website from Defendant's IP address, the possibility that this visit was made innocently is not fatal to the probable cause calculus. *See Daigle*, 178 F.4th at 62 ("[A]n officer [need not] rule out potentially innocent explanations for every piece of evidence before reaching a reasonable conclusion that there is probable cause") (citation omitted); *United States v. Tagg*, 886 F.3d 579, 589 (6th Cir. 2018) ("[T]he ultimate plausibility of an innocent explanation cannot be used to snuff out the objectively suspicious inference that can be drawn from the facts presented to a magistrate.") (citing *District of Columbia v. Wesby*, 583 U.S. 48, 61-62 (2018)). In this case, I am not persuaded that the existence of content that may be legal alongside content that is clearly not so weakens the inferences to be drawn as to destroy probable cause altogether.

## CONCLUSION

Defendant's Motion to Suppress (ECF No. 92) is DENIED.

SO ORDERED.

Dated this 27th day of August, 2026.

/s/ Lance E. Walker
Chief U.S. District Judge